[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, who is in the custody of the Commissioner of Correction, alleges that he is subject to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. According to the petitioner, the Eighth Amendment violation arises from his placement in a "behavior modification experiment against [his] will, as an involuntary subject[.]" Tr. (Aug. 15, 2001), at 5-6. Though at the time of trial the petitioner was not in the Chronic Disciplinary Unit program, the program in question, he has previously been in the program three times. Id., at 10.
"Cruel and unusual punishment refers to punishment that involves the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the crime. In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates." (Internal citations and quotations omitted.) Santiago v.Commission of Correction, 39 Conn. App. 674, 683, 667 A.2d 304 (1995).
The petitioner argues that the Chronic Disciplinary Unit is a form of treatment which he, as a competent adult, has the right to refuse. Tr. (Aug. 15, 2001), at 17. The alleged group therapy that the program CT Page 16067 subjects the petitioner to infringes upon his right to privacy by obligating him to reveal personal information. Id., at 17. The petitioner also claims that the program forced him to recite religious prayers.Id., at 28. All of these aspects of the program, according to the petitioner, support his assertion that the Chronic Disciplinary Unit serves no valid penalogical interest. Id., at 15-6. Lastly, the petitioner states that he signed the acknowledgment form, which is a prerequisite to participating in the program, "under duress and the physical threat of . . . indefinite punitive confinement, and have done that on three different occasions." Id., at 39
Joseph O'Keefe, a counselor supervisor and Assistant Director in the Offender Classification and Population Management Unit, Department of Correction, testified that the petitioner is currently a level four inmate in the general population, having received a total of eighty-four (84) tickets for disciplinary violations since 1987. Id., at 92-3. Level five is highest form of security classification; level one, conversely, is the lowest. Id., at 90. Classification of inmates within the corrections department is an "ongoing process" which utilizes "many factors to determine what is in the best interest of an inmate." Id., at 89. Such factors include the inmate's criminal history, educational background, and medical and mental health background. Id. An inmate is also assessed for what programs would enhance the stay while incarcerated. Id. Additionally, the department looks at risk factors such as escape risk, severity of the inmate's crime, length of sentence, and whether the inmate is a discipline problem. Id. "[T]he primary goal is to ensure the safety of the public, the safety of [corrections staff], and the safety of all . . . inmates." Id., at 90.
Doctor Patrick Hynes, the Director of Program Development, Department of Correction, testified that there are several reasons why inmates are given programs: 1) to "help inmates behave themselves while they're in facilities;" 2) the Department of Correction is mandated to do certain types of programs; and 3) to facilitate the eventual return of inmates into society and reduce the likelihood of return to incarceration. Id., at 48. Dr. Hynes further testified that there are over three-hundred programs in the twenty corrections facilities, including "a number of programs that are specifically designed to help inmates who are having behavioral problems in the department[.] They include the Chronic Disciplinary Unit, Administration Segregation Program[, and] . . . two separate programs for people who are involved with security risk groups."Id., at 49.
Dr. Hynes described the Chronic Disciplinary Unit as being "designed to help inmates who are getting into a lot of trouble repeatedly by receiving a number of disciplinary reports[.] Id., at 50. Prior to the CT Page 16068 creation of the Chronic Disciplinary Unit, such problem inmates received a "kind of punitive response[.]" Id. The program was created to help problem inmates "develop some skills, some ways to stay out of trouble, and to respond differently to the inevitable frustrations and problems that [are] encounter[ed] in any prison setting." Id. Specifically, the unit is designed to help inmates change their behavior by thinking and communicating in different ways, changing their attitudes, ultimately allowing the inmates to do better not only in prison but also in society upon release. Id., at 54.
Dr. Hynes denied that programs such as the Chronic Disciplinary Unit are mental health treatment; instead, such programs are self-development courses. Id., at 60. The allegation that participants are forced to divulge personal information was also denied: inmates are expected to communicate and share to the extent that they are comfortable in doing so, and "[i]f at some point there are things that [the inmate doesn't] want to talk about. . . . that would be absolutely no problem[.]" Id., at 61-2.
Inmates must sign an acknowledgment form prior to participating in the Chronic Disciplinary Unit program. Id., at 74. "This acknowledgment form . . . basically says that you understand what's expected of you in the program, and that you agree to participate in [the program]." Id. Participation in the program is conditioned on signing the acknowledgment form. Id., at 75. Refusal to sign the acknowledgment form results in a great likelihood of classification in Administrative Segregation. Id. Inmates who do not participate respectfully in the Chronic Disciplinary Unit are not automatically sent to the more restrictive Administrative Segregation classification: the inmate needs to flagrantly continue to disobey orders, get into trouble, and steadfastly refuse to participate in the program at all to be recommended for Administrative Segregation placement. Id., at 63. An inmate who is reclassified receives a hearing and due process is followed. Id., at 91.
Dr. Hynes testified that the prayer the petitioner is complaining about in this petition is the serenity prayer. The prayer was located in a section of one of the manuals and "attempt[ed] to have inmates understand a basic idea . . . that we can't control everything in our lives, there are some things that are beyond our control, and the more we understand that, the better off [we are]. . . . Many, many inmates have found that very helpful, and so we included it in [the manual]. I made it very clear to everyone that it wasn't a religious prayer." Id., at 66.
Based on the foregoing, this Court finds that the petitioner is not being subjected to punishment that involves the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the CT Page 16069 crime. In fact, the Chronic Disciplinary Unit program, established as an alterative to strictly punitive sanctions imposed on problem inmates, was developed by the Department of Correction to serve the valid penalogical interests of managing inmate population and facilitating an inmate's eventual transition from incarceration back into society. The petitioner's claim that he is an involuntary subject in a behavior modification experiment is erroneous and entirely without merit. The petition seeking habeas corpus relief is denied.
HON. DAVID M. BARRY, JUDGE